David Earl GIBBS, Appellant,

v.

The STATE of Texas, Appellee.

No. 69638.

Court of Criminal Appeals of Texas,
En Banc.

June 19, 1991.
Rehearing Overruled Sept. 18, 1991.

John F. Pettit, Larry Foerster, Conroe, for appellant.

Peter C. Speers, III, Dist. Atty., and Thomas D. Glenn, Asst. Dist. Atty., Conroe, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

WHITE, Judge.

Appellant was convicted of capital murder. See V.T.C.A., Penal Code, § 19.-03(a)(2). After the jury made an affirmative finding on both of the special issues submitted under Art. 37.071(b)(1) and (2), V.A.C.C.P., the trial court imposed the penalty of death. This case is before us on direct appeal.

Appellant brought a total of eleven points of error to this Court, including arguments that the evidence was insufficient to support the jury's finding that he was guilty of the capital murder of Marietta Bryant. We will affirm the judgment of the trial court. A review of the facts is necessary.

Marietta Bryant, twenty-nine years of age at the time of her death, lived with Carol Ackland at 803 N. Thompson, Apt. D, in the City of Conroe in Montgomery County. Both women were outpatients of the Texas Department of Mental Health and Mental Retardation. In the past, Ms. Bryant and Ms. Ackland had both been hospitalized with mental health and emotional problems. Ms. Bryant had suffered from a shared schizophrenic condition, and her personal development at age 29 was that of an adolescent. In March of 1985, they were assigned to Chris Ward, a caseworker with MHMR, who helped them find their apartment and their jobs. They were employed by Tri–County MHMR Industries, working on a road crew picking up litter along the highways of Montgomery County. According to Ward, both Bryant and Ackland were making tremendous progress in their development as outpatients. Marietta Bryant showed no symptoms of mental illness. Ward felt they were doing well enough, that he only needed to visit with them twice a month.

On July 12, 1985, Ward became concerned for the well-being of Bryant and Ackland when he was informed that they had not reported for work on July 2, or any day thereafter. On Monday, July 15, Ward went to their apartment and knocked on the door. There was no answer. Ward noticed a strong, foul odor emanating from the apartment and saw many flies buzzing around the door. Ward saw a door tag from a cable installer which noted that he had been by on July 2, but had not been able to gain admittance to the apartment. Ward returned again on July 16 and conditions had not changed at the apartment. He went to the Conroe Police Department and notified the authorities. Ward then contacted Marietta Bryant's brother and sister-in-law to meet him at the apartment.

When Ward and the Bryants arrived, the police were already at the apartment. Of-

ficer Reynolds noticed the odor of something dead emanating from the apartment. He called for assistance from Chief Lindon and Deputy Chief Arthur before proceeding. After entering the apartment from a rear, unlocked window, Reynolds was struck both by the terrible strength of the odor and the very cold temperature inside the apartment. He found a body, later identified as Carol Ackland, in the kitchen area of the apartment. He found another body, later identified as Marietta Bryant, in the bathroom. Next to Bryant's body were a large butcher knife and a bottle of Mazola cooking oil. Reynolds saw large pools of blood and cooking oil on the floor around both bodies. Reynolds verified that both women were dead, then secured the crime scene for investigation.

Autopsies were performed on the bodies of Ackland and Bryant on July 17. Both bodies were in an advanced state of decomposition. The Harris County Medical Examiner determined that both women died from having their throats cut by a sharp object, at least two weeks before the autopsy was performed. Neither woman exhibited trauma around the vagina or vulva. At trial, the medical examiner testified that as a byproduct of decomposition, evidence of trauma will disappear. Because maggots attacked these areas of the women's bodies, the medical examiner could not be certain if there had been a trauma. Marietta Bryant had a large gaping neck wound, as well as defensive wounds to her hands, wrists, and arms. Bryant's neck wound was the result of a right to left cut, indicating to the medical examiner that the assailant had been left-handed. The medical examiner believed the fatal wounds to each victim were possibly inflicted by the same knife.

Officer Reynolds supervised the investigation of the crime scene. In the bathroom, Reynolds found a burnt matchstick on Bryant's body and a cigarette butt in the sink. He also found a book of matches from Mac's Lounge. He discovered the thermostat of the apartment had been set at its coldest possible setting. The apartment had been ransacked, but there was no sign of forced entry. Under Reynolds' direction, latent fingerprints were taken throughout the apartment. On July 29th, Marietta Bryant's brother was permitted in the apartment to look after her effects. He discovered that her most prized possession, a radio/cassette player which he and his wife gave her for Christmas in 1984, was missing. He informed the police and gave them the model number from the warranty card.

At the time of the deaths of Bryant and Ackland, appellant worked at their apartment complex and lived there. Appellant came to the attention of Officer Julie Easter on July 2nd after 2:00 a.m., when she answered a disturbance call at his downstairs apartment. Appellant reported a break-in at his apartment and the apartment next door to his. Officer Easter came to the conclusion that appellant had been drinking. Appellant behaved strangely, between nervous and angry, when she questioned him about the break-ins. Because the sole of appellant's sneaker exactly matched the sneaker print on the door, Officer Easter concluded appellant kicked in the door of the apartment next door. When Officer Easter arrived at the scene of the murders on July 16th, she immediately focused on appellant as a suspect, and advised Officer Reynolds about the reasons for her suspicions. The Police Department began to investigate appellant's possible connection to the instant offense.

In the early morning of July 18th, the police went to the Willis Convalescent Center in Conroe where appellant worked as a nursing attendant. The officers asked appellant to accompany them to the police station, and he complied with their request. After some investigation, the police took appellant to the home of Wanda McNeil, where he was presently living. Appellant had moved in with McNeil in early July. Later that day, the officers went to the McNeil residence and asked appellant to come to the station with them to talk. He agreed. Wanda McNeil picked him up later that evening. At no time was appellant placed under arrest. The Conroe police investigators said appellant could have refused their requests for interviews and

they would not have detained him. They also said he was free to leave them at any time.

On July 19th, appellant agreed to go with the police to take a polygraph examination, the results of which were never admitted into evidence. Upon their return to Conroe, appellant signed a consent to search his old apartment. Appellant was present while the police conducted their search. They found a pack of Doral filter lights cigarettes, the same brand as the butt left in the bathroom sink at the murder scene. The police also found a pair of boots. Laboratory analysis later detected the presence of human blood on them. Appellant left the police station later that day with Wanda McNeil. Appellant was again interviewed on July 23rd, 25th and 27th. Each time he was not placed under arrest, and left the police station with Wanda McNeil. On each of these occasions, appellant was free to leave and terminate the interview at any time. Appellant was informed of his rights each time. Appellant never requested the assistance of an attorney.

On July 29th, Marietta Bryant's brother informed the police of the missing radio. On the 30th, the police learned appellant had a radio similar to Marietta's. The Conroe Police Department was now being assisted by Investigator Charles Ray of the Montgomery County District Attorney's Office and by Texas Ranger Wesley Stiles. They went to the McNeil residence and, pursuant to a consensual search, recovered a radio identical to the one owned by Marietta Bryant. It had the same model number as that of Ms. Bryant's radio. Wanda McNeil told the officers appellant brought the radio to her house. The police requested appellant to accompany them to the police station. Appellant agreed. At 4:30 p.m. on the 30th, Officer Reynolds arrested appellant for murder pursuant to an arrest warrant and complaint for the murder of Marietta Bryant. At 4:40 p.m., appellant was taken by Reynolds before a magistrate where he received his statutory warnings. Appellant was then returned to the police station where the police apprised him of his rights, and then interrogated him. Late that evening, appellant said he was tired,

and the police took him to his cell to go to sleep. At no time on the 30th did appellant ever request a lawyer, or indicate that he wanted to terminate the interviews.

Appellant's fingerprints were checked against the latent prints found in the victims' apartment. Appellant's prints were found on the inside of the front entrance door, on the refrigerator and on a band-aid box recovered from the bathroom. The police interviewed David Peters, an acquaintance of appellant, who had been with him on the evening of July 1st. Appellant and Peters were drinking and shooting pool at Mac's Lounge in Conroe. Appellant was wearing a pair of boots that Peters said were similar to the ones recovered in the search of appellant's apartment. Appellant left at midnight. When appellant returned to the bar, Peters noticed he was wearing different clothes and shoes.

On July 31st, Wanda McNeil went to the Conroe Police Station to see appellant. She spoke with appellant believing him to be innocent. She knew appellant was charged with murder. At trial, she testified that Ranger Stiles told her that if appellant confessed, the State would not seek the death penalty. Ranger Stiles denied that he ever made any such promise to her or to appellant. Investigator Ray supported Stiles' testimony. McNeil advised appellant to tell the officers the truth about what happened. She never suspected that he would confess to committing the murders. Early on the afternoon of the 31st, appellant gave a confession on videotape. This was never admitted into evidence. Later in the evening on the 31st, at 7:30 p.m., appellant asked a jailer to get Ray for him, that he wanted to talk to the D.A.'s Investigator.

Ray gave appellant his warnings. Appellant acknowledged that he understood the warnings. Appellant told Ray he was willing to waive his rights and make a statement. At 9:15 p.m., after appellant's statement had been reduced to writing, appellant signed the statement in the presence of witnesses, attesting to the fact that it was voluntary and true. Ray later testified that appellant signed the confession

with his left hand. According to the witnesses and Ray, appellant read it through, initialling each of the warnings and the conclusion of each paragraph. The appellant's confession, as admitted into evidence at his trial, reads as follows:

"On July 1st, 1985, I decided sometime around midnight to go over to Carol's apartment. When I left Mac's, I went home to the apartments and went straight up to Carol's apartment. I knocked on the door and Carol answered. She was mad and upset that I had came over so late and that I had come over while Mary was there. Carol didn't want to let me in but I pushed my way on into their apartment. When inside, Carol and I began arguing and fighting and Mary woke up and came into the living room. Mary wanted to know who I was and why I was there. I was mad and got a knife from somewhere in the apartment and made Mary go back into the bedroom. We sat on the bed, Carol and Mary on one in the corner and me on the other one. I made Mary go back into the bathroom and probably told her to keep quiet. I gave Mary some magazines, I believe they were *People* magazines, which I believe came off the dresser in the bedroom. I asked if she wanted a cigarette; she said she didn't, that she didn't smoke that often. I don't remember when it was, but at some point in time, I took my boots off because my feet were hurting from walking all over the town with Peter that day. Carol and I then went into the kitchen and made coffee because I wanted to talk to Carol and hold her but she would not have any of it. I closed the bedroom door. As Carol was fixing to make coffee, I told her to lay down on the kitchen floor. I forced her to have sex with me. I got some cooking oil from the cabinet and while she was on the floor, I had sex with her from the rear, both anal and vaginal. While I was having sex with her, I cut her throat. I don't know why I did it. I left Carol face-down in the kitchen and went back to the bathroom where Mary was. I believe before I went back there I washed my hands.

Mary was sitting on the john reading a magazine. I went down and sat on the bathroom sink, staring at her and thinking to myself, if she hadn't been here these things wouldn't have happened. I then made her get down on the bathroom floor. I had sex with Mary both anal and vaginal and had to use the cooking oil which I had used on Carol. Mary had been laying face-down during sex. After I finished having sex with Mary, I was behind her as she was laying there in the bathroom, and I cut her from behind. After she was cut, she flopped over on her side and sat up and for the first time since I had come into the bathroom, she looked me straight in the eyes and seemed to know what had happened. I left the knife and the cooking oil in the bathroom. They were both dressed in nightgowns. I believe Mary had on a blue nightgown and Carol a pink one. It had been hot in the apartment and I turned the air conditioner on. After I killed them, I wanted to make it look like a robbery and I began to dump stuff out of purses, dumping things out on the floor out of the bedroom closet and between the beds. After this, I can't remember what I used, but I used something to wipe everything clean. When I left Carol and Mary's apartment, I took the portable radio where I could have something of Carol's and I went downstairs to my apartment and showered and changed clothes. I was still very angry and when I was fixing to leave my apartment, I messed up the inside of my apartment and left the door open. I also kicked open the door to Apartment A in order to make it look like someone had been breaking into the apartments. After I had done this, I left the apartment and went to Mac's. I went inside and had a couple of beers. I set down with David Peters and he was drunk and passing out. The lady that was running the bar asked me to get him out of there so I took him outside and tried to get him to my apartment. Peters was too drunk and we ended up getting into a fight. He was trying to accuse me of robbing him. At this point, I just left. That is

where I was walking down the street and saw the patrol car. I have given this statement to Charlie Ray, District Attorney Investigator, on my own free will without any kind of a promise and was "under no duress...."

■ In appellant's first point of error, he argues that he is entitled to a reversal because the statement of facts does not include the court reporter's notes of a pre-trial hearing on September 6, 1985 in which the trial court took up eight of appellant's pre-trial motions. Appellant contends it was error to certify the record as being complete because the court reporter's statement of facts doesn't include the court reporter's notes taken at the September 6, 1985 pre-trial motions hearing before the trial court. Appellant relies on Tex.R.App. Proc. Rule 50(e) to support this point of error.

Disposition of this point of error is controlled by Tex.R.App.Proc. Rule 50(e). This conclusion follows from *Harris v. State*, 790 S.W.2d 568 (Tex.Cr.App.1989). In that case, as in the instant case, the defendant contended he was entitled to a new trial because portions of the record had been lost. In *Harris*, disposition of the point of error was controlled by Art. 40.09, V.A.C.C.P., (repealed 1986) because the objection to the record was made before September 1, 1986[1], specifically within fifteen days of the last notice of the record's completion. In the instant case, appellant filed his objection to the record on June 19, 1987, after receiving two extensions of time to file that objection. Appellant received his notice that the record was complete on April 10, 1987. We will therefore apply Rule 50(e) to this point of error.

Rule 50(e) sets out:

**(e) Lost or Destroyed Record.** When the record or any portion thereof is lost or destroyed it may be substituted in the trial court and when so substituted the record may be prepared and transmitted to the appellate court as in other cases. If the appellant has made a timely request for a statement of facts, but the court reporter's notes and records have

been lost or destroyed without appellant's fault, the appellant is entitled to a new trial unless the parties agree on a statement of facts.

The state argues that Tex.R.App.Proc. Rule 11(a)(1) is also important to the disposition of this point of error. Rule 11(a)(1) sets out that an official court reporter will attend all sessions of court and make a full record when requested by the judge or any party to the case. Under the facts of the instant case, we agree that Rule 11(a)(1) is also important to the disposition of the first point of error.

On August 4, 1987, the trial court held a hearing on appellant's objection to the statement of facts. At that hearing, appellant complained, as he does in this point of error, that there was no record of the September 6, 1985 pre-trial hearing on eight of the pre-trial motions which he filed in this cause. It appears that testimony of witnesses was not taken and exhibits were not entered at the September 6th hearing. The trial court concluded that every motion, or its duplicate, that was considered in the September 6, 1985 hearing was found in the written record of the file and shown to have been ruled upon. The trial court ruled that the record was complete.

More importantly, at the August 4, 1987 hearing the trial court and the parties agreed that it could not be determined if a record was or was not made of the September 6, 1985 pre-trial hearing.

COURT: I think that we can agree, that the parties can agree and stipulate, I assume, and correct me if I'm wrong, that you've discussed this matter with the reporter and the reporter has made a diligent search for any record that was made that day and the record was either not made or has been lost. Can we agree to that?
APPELLANT: "The defendant will agree to that."
COURT: "Okay. The Court is going to take as conclusive that there was either not a record made that day or it has been lost."

Tex.R.App.Proc. Rule 50(e).

Our examination of the record in the instant case supports this conclusion. That examination also revealed that the record does not show appellant, the trial court, or the state ever requested that the court reporter be present at all sessions of the instant trial.

Further colloquy between the trial court and the parties reveals the harmless nature of what transpired in court at the Discovery Motions hearing on the day in question:

> STATE'S ATTORNEY: So, anything that the court ruled on in the first Motion for Discovery was also ruled on by the same Court in subsequent Motions for Discovery?
>
> DEFENSE COUNSEL: I think that by the time we got to trial all of our motions had been ruled upon and we knew what the Court's rulings were on them.[2]
>
> STATE'S ATTORNEY: So, is there any claim that you representing Mr. Gibbs that any harm has occurred to him by the reporter's inability to find these notes that you're requesting?
>
> DEFENSE COUNSEL: Well, I simply, I don't know what the record would reflect. As far as our knowing, going into trial and being surprised as a result of anything that, as the result of the lack of that September 6th proceeding, no.
>
> STATE'S ATTORNEY: Again, I want to be sure that I understand. Everything that was contained in your first Motion for Discovery was also contained in the subsequent Motions for Discovery and were again ruled on by the Court?
>
> DEFENSE COUNSEL: That's probably correct.
>
> TRIAL COURT: Well, as I understand it Mr. Pettit, there were no matters of discovery that you requested a ruling on that are, that were not given to you. Every request for discovery that was denied is in the record; is that correct?
>
> DEFENSE COUNSEL: Yes, it's contained in the transcript, Your Honor, I believe. I think the Court noted its rul-

ings in the margin of our documents on file with the papers of the Court."

This Court's decision in *Dunn v. State*, 733 S.W.2d 212 (Tex.Cr.App.1987) is helpful in the disposition of this point of error. Even though it was written on facts controlled by old Art. 40.09, V.A.C.C.P. (repealed), the principles discussed in that decision apply to analysis under Rules 11(a)(1) and 50(e).

In *Dunn*, 733 S.W.2d, n. 2, at 213, the defendant's pretrial motions "did not designate the pretrial evidentiary hearing as one of the proceedings of which shorthand notes should be made." However, in *Dunn, supra*, it was clear that the court reporter was present at the hearing and did take shorthand notes. Under Art. 40.09, V.A.C.C.P., (repealed), a portion of the proceedings shown by the notes of the reporter in *Dunn* were missing. This contrasts with the instant case.

In the instant case, appellant did not request, either unequivocally in a timely written motion or implicitly in the record, that the court reporter take shorthand notes of the pretrial hearings. Tex.R.App. Proc.Rule 11(a)(1). As the record of the hearing on appellant's objections to the statements of facts shows, it was not clearly apparent that a record was kept of that hearing. Contra *Dunn, supra*, n. 2, at 213. Under Tex.R.App.Proc.Rule 50(e), it cannot be ascertained that a portion of the court reporter's notes and records taken in the instant case has been lost or destroyed. As such, appellant is not entitled to a new trial under Rule 50(e). Appellant's first point of error is overruled.

In appellant's second point of error, he argues that it was error for the trial court to overrule his motion to suppress his confession because that confession was tainted by an illegal arrest. Appellant contends that the arrest was illegal because it was made pursuant to a warrant supported by an affidavit which did not allege sufficient facts to support an independent finding by a neutral and detached magistrate that

---

**2.** Contained in our record are the eight motions heard by the trial court on September 6, 1985 and his rulings.

probable cause existed for that arrest. Appellant also contends the taint from this illegal arrest was not attenuated from his confession. In his third point of error, appellant argues it was error for the trial court to admit his confession into evidence over this objection. In his brief, appellant grouped these two points of error under a single argument.

An averment in an arrest warrant affidavit must be supported by sufficient facts before the affidavit may rise to the level of showing probable cause. *Rumsey v. State*, 675 S.W.2d 517 (Tex.Cr.App.1984). In the instant case, the affiant, Officer Reynolds, averred that appellant intentionally and knowingly caused the death of Marietta Bryant. This Court has summarized the following facts which affiant offered in support in his affidavit:

1. That affiant discovered the body of Marietta Bryant in her apartment, with her throat cut and a bloody knife nearby.

2. That appellant was employed as a handyman-caretaker at the victim's small apartment complex.

3. That Officer Julie Easter advised affiant that on the night of the murder, appellant flagged her down near the complex at about 2:00 a.m. to report that David Peters had ransacked appellant's apartment and kicked open the door to another apartment. Easter advised affiant that she became convinced appellant kicked open the door to the other apartment himself. The residents of this other apartment reported nothing missing.

4. That appellant was on parole for robbery and theft. That appellant advised that he had not lived in his own apartment since July 2, 1985, and had moved in with Wanda McNeil.

5. That Department of Public Safety officer, Hilton Kennedy, a polygraph operator, advised affiant that in a non-custodial interview, appellant stated that he lied about Peters being in his apartment and kicking open the door to the other apartment. Kennedy advised affiant that appellant admitted he kicked open the door to the other apartment himself, and lied in his report to the police that

Peters had been responsible. Kennedy also advised affiant that appellant showed deception on the polygraph when he denied killing the victims, when he denied being in their apartment when they were killed, and when he denied sexually assaulting the victims on the night they were killed.

6. That a consensual search produced a pair of boots that the Department of Public Safety lab personnel determined were stained with human blood. That Charles Ray advised affiant that David Peters told Ray that appellant was wearing a similar pair of boots early in the evening on July 1, 1985, but that they were not stained at that time. After appellant had been absent from Peters for about an hour, appellant returned to a local bar where Peters noticed appellant had changed clothes and was no longer wearing the boots.

7. That William Bryant, Marietta's brother, advised affiant that Marietta owned a Sears stereo radio/cassette player which was missing from the apartment after the murder. William Bryant provided affiant an owner's manual containing the model numbers of the said radio. On July 30, 1985, affiant was advised by Detective John Stephenson that he recovered a radio/cassette player of the exact description and model number from the residence of Wanda McNeil pursuant to a consent to search. McNeil advised Stephenson that appellant had brought that radio/cassette player to her home during the first week of July, 1985. Stephenson also advised affiant that he had been informed by Connie Christopher, who resided with appellant at his apartment until June 14, 1985, that appellant did not own such a radio/cassette player at that time. Affiant had been advised by William Bryant that he had last seen the radio/cassette player in the victim's apartment in Mid-June, 1985.

Appellant argues that the affidavit does not pass the *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) test for reliability and for determining whether, based on the totality of the circumstances,

the officer had a substantial basis for suspecting appellant was involved in the murder of Marietta Bryant. Appellant cites *Starkey v. State*, 704 S.W.2d 805 (Tex. App.—Dallas, 1985) for support of his argument.

We find *Starkey v. State* to be distinguishable on its facts from the instant case, and not controlling. In the arrest warrant affidavit in *Starkey, supra,* at 809–810, the affiant made the following assertions to support his averment that the defendant murdered the victim: that the victim's billfold was not found on his body, or nearby, when his body was discovered; that the victim owed the defendant an unknown amount of money; and that the defendant boasted on several occasions to unnamed individuals that he killed the victim. In contrast to *Starkey*, in the instant case Reynolds, the affiant, named and identified each of his sources of information; the appellant himself provided several pieces of the puzzle; and the radio stolen from the victim was recovered from appellant. There was no unsubstantiated hearsay to unnamed sources as the sole connection of appellant to the murder of the victim in Reynolds' affidavit. *Starkey* does not support appellant's argument.

The trial court conducted a hearing on the voluntariness of appellant's confession, overruled appellant's motion to suppress, and entered a written conclusion of law that "the arrest warrant was based upon an affidavit which alleged sufficient facts and information to support an independent judgment by a neutral magistrate that probable cause existed for the issuance of the warrant." The trial court also concluded that the confession was made voluntarily and without coercion.

■ The trial court is the exclusive judge of the credibility of the witnesses and the weight to be given the testimony at a suppression hearing. *Nichols v. State*, 754 S.W.2d 185, at 191 (Tex.Cr.App.1988). We find that the trial court's conclusion of law in the instant case is supported by the factual record; specifically, that the averment was supported by sufficient facts to raise it to the level of showing probable

cause. Therefore, there was no illegality within the arrest to taint appellant's confession.

■ To determine if probable cause existed for the issuance of the warrant, we are guided by the principles set out in *Lagrone v. State*, 742 S.W.2d 659 (Tex.Cr. App.1987), U.S. cert. denied 485 U.S. 937, 108 S.Ct. 1115, 99 L.Ed.2d 276 (1988). Though we are limited to the four corners of the affidavit on the question of sufficiency, we do not place blinders on the process whereby a neutral and detached magistrate must decide whether there are sufficient facts stated to validate the issuance of a proper warrant. A warrant affidavit should be interpreted in a common sense and realistic manner. The reviewing magistrate is permitted to draw reasonable inferences from the facts supporting the averments. *Lagrone v. State*, 742 S.W.2d, at 661; *Lopez v. State*, 535 S.W.2d 643 (Tex.Cr.App.1976); and *Jones v. State*, 568 S.W.2d 847 (Tex.Cr.App.1978).

Officer Reynolds' averment in his affidavit in the instant case is supported by facts sufficient to rise to the level of showing probable cause. Reynolds' affidavit contained more than a mere conclusion that appellant committed the crime charged. Compare *Rumsey v. State*, 675 S.W.2d, at 518–519. Reynolds' affidavit contained more than unsubstantiated and unattributed hearsay. Compare *Starkey v. State*, 704 S.W.2d, at 809–810. Instead, Reynolds' conclusive averment that appellant murdered Marietta Bryant was supported by sufficient factual allegations so as to permit the reasonable and logical inference of a nexus between appellant and the crime charged: that appellant was in the proximity of the location of the crime at the time it was committed; that appellant wore his boots up until the time he left Peters, but that when he returned he was no longer wearing them; that these same boots were stained with human blood when recovered from his apartment at the complex where the crime was committed; that he concocted a series of lies to divert the attention of the police away from him and the commission of the crime; and that property stolen

from the victim of the murder was recovered from his possession.

This Court's conclusion that the affidavit contained sufficient facts to provide the necessary inferential nexus between appellant and the murder of Marietta Bryant, so that it constituted probable cause for the magistrate's issuance of the warrant, forecloses any analysis of attenuation of the taint of the arrest from a subsequent confession. *Rumsey v. State, supra;* and *Lagrone v. State, supra.* The trial court did not err either when it overruled appellant's motion to suppress or when it admitted his confession into evidence. "Because the trial court is the sole trier of facts at the hearing to determine voluntariness and admissibility, this Court is not at liberty to disturb any finding which is supported by the record." *Self v. State,* 709 S.W.2d 662, at 665 (Tex.Cr.App.1986), and cases cited therein. We find that the record supports the trial court's decision in the instant case. Appellant's second and third points of error are overruled.

■ In appellant's fourth point of error, he argues that the trial court erred when it refused to submit his requested instruction on the lesser included offense of murder. Appellant alleges there was some evidence raising the fact issue of whether he had committed or attempted to commit the felony offense of burglary of a habitation. In his fifth point of error, appellant argues that the trial court also erred in its refusal to submit his requested instruction on the lesser included offense of murder, where he alleges there was some evidence raising the fact issue of whether he had committed or attempted to commit aggravated sexual assault. Appellant grouped both points of error in the same argument in his brief.

Appellant prefaces these two points of error on the issue of whether there was evidence at trial for the jury to believe beyond a reasonable doubt that appellant was attempting to commit or committing burglary or aggravated sexual assault. Appellant supports these arguments by pointing out alleged deficiencies in his confession. Appellant presented no evidence in defense during his trial.

Appellant bases his fourth point of error on the contention that he does not state in his confession that he entered the victim's apartment with the intent to commit a felony or theft, but only to visit Carol. Appellant states that this raises the issue of whether he entered the apartment without the effective consent of the victim. Appellant contends the only evidence to support the supposition of burglary were the presence of his fingerprints inside the apartment and his possession of the victim's radio. Appellant points out that since he was employed as the maintenance man at the apartments, he had legitimate access to the victim's apartment; therefore, there was insufficient evidence that he burglarized the apartment. Appellant bases his fifth point of error on his contention that there was no evidence that appellant had sex with Marietta Bryant without her consent. Appellant believes that these fact issues at trial were in dispute, so that the jury could have concluded that he merely murdered the victim.

■ Appellant cites *Lugo v. State,* 667 S.W.2d 144 (Tex.Cr.App.1984) and *Bell v. State,* 693 S.W.2d 434 (Tex.Cr.App.1985) for the principle that if evidence from any source raises the lesser included offense, the requested instruction must be given. It does not matter if the evidence is strong or weak, unimpeached or contradicted. *Bell, supra,* at 442–443. A reviewing court must consider all the evidence at trial in making this determination. *Lugo v. State, supra.* While we agree with the principles of law cited by appellant, we note that they do not present a complete picture of all the guiding principles on this issue nor of all the true facts.

In *Aguilar v. State,* 682 S.W.2d 556 (Tex.Cr.App.1985), this Court adopted the two-prong test set down in *Royster v. State,* 622 S.W.2d 442 (Tex.Cr.App.1981). The first prong requires that the lesser included offense must be included within the proof necessary to establish the offense charged. Secondly, there must be some evidence in the record that if the defendant is guilty, he is guilty only of the lesser included offense. *Aguilar v. State, supra,*

at 558; *Moreno v. State,* 721 S.W.2d 295, at 301–302 (Tex.Cr.App.1986); and *Lincecum v. State,* 736 S.W.2d 673, at 678 (Tex. Cr.App.1987). Under the second prong of the test, the evidence in the instant cause fails to raise the lesser included offense of murder.

Concerning the element of burglary of a habitation, appellant's confession shows that Carol Ackland refused appellant permission to enter the apartment so that he had to force his entry: "Carol didn't want to let me in **but I pushed my way on into their apartment.**" There is nothing in appellant's confession, or anywhere else in the record of the trial, to indicate that appellant expected to be welcomed into the apartment, or to raise the issue that the victim consented to his entry into the apartment. Appellant's confession demonstrates that he intended to commit and committed the felony offense of burglary of a habitation.

Concerning the element of aggravated sexual assault, appellant's confession shows that at all times appellant forced Marietta Bryant at knifepoint to comply with his orders: "Mary wanted to know who I was and why I was there. I was mad and got a knife and made Mary go back into the bedroom.... I made Mary go back into the bathroom and probably told her to keep quiet.... I went down and sat on the bathroom sink, staring at her and thinking to myself, if she hadn't been there these things wouldn't have happened. I then made her get down on the bathroom floor. I had sex with Mary both anal and vaginal and had to use the cooking oil which I had used on Carol.... After I finished having sex with Mary, I was behind her as she was laying there in the bathroom, and I cut her from behind." There is nothing in appellant's confession, or anywhere else in the record, to raise the issue that the victim consented to having sex with appellant.

Under either the fourth or fifth points of error, the record before us is devoid of any evidence from which a rational trier of fact could have concluded that if appellant was guilty, he was guilty only of the lesser included offense. *Moreno v. State,* 721 S.W.2d, at 302.

Also, appellant did not testify nor did he offer any testimony which might reasonably raise the lesser included offense which he speaks of in his fourth and fifth points of error. The fact that the state in the course of proving the offense of capital murder may also have proved a lesser offense does not entitle appellant to a charge on the lesser included offense. *Cordova v. State,* 698 S.W.2d 107, at 113 (Tex.Cr.App. 1985), U.S. cert. denied 476 U.S. 1101, 106 S.Ct. 1942, 90 L.Ed.2d 352 (1986). Appellant's fourth and fifth points of error are overruled.

In his sixth point of error, appellant alleges that the trial court erred when it overruled his motion for an instructed verdict because there was insufficient evidence to corroborate his confession. In his seventh point of error, appellant alleges that the trial court erred in overruling his motion for an instructed verdict because there was insufficient evidence to support all of the elements alleged for the underlying offenses of burglary of a habitation and aggravated sexual assault. Specifically, appellant argues there was no independent evidence appellant entered the apartment without the effective consent of Marietta Bryant, and that there was no evidence that appellant penetrated the anus or vagina of Bryant, or did so without her effective consent. In his eighth and ninth points of error, appellant argues there was insufficient evidence to support the jury's verdict because there was insufficient evidence to corroborate appellant's confession and because there was insufficient evidence to prove the elements of the underlying offenses of burglary of a habitation and aggravated sexual assault. Appellant groups all four points of error under the same argument in his brief.

The essence of appellant's argument is that the state failed to prove by evidence independent of his confession either the corpus delicti of the element of burglary of the habitation of Bryant or the corpus delicti of the element of aggravated sexual assault of Bryant. Appellant alleges that

the state is bound to prove by sufficient evidence all of the material elements of the charged offense of capital murder of Marietta Bryant. Appellant asserts that an extrajudicial confession may be used as direct evidence of his guilt, provided there is evidence of the corpus delicti, but that, standing alone, an extrajudicial confession is insufficient to establish the corpus delicti. Appellant asserts that if the corpus delicti is not established by evidence independent of the extrajudicial confession, the confession can't be considered in determining the sufficiency of the evidence. In his own case, appellant contends there is no evidence independent of his confession to show either that he entered the apartment without the effective consent of Marietta Bryant, or that he had sex with her without her consent, or that he penetrated her anus or vagina with his sexual organ; therefore, the state failed to prove the corpus delicti of the underlying elements of burglary of a habitation or aggravated sexual assault.

Appellant cites no authority in support of his argument that the state was bound to prove the corpus delicti of the underlying offenses of burglary of a habitation and aggravated sexual assault. We have found no authority to support this argument.

We do agree with appellant that the state is bound to prove beyond a reasonable doubt all of the component elements of the capital murder of Marietta Bryant. We will address first whether the state has proven the corpus delicti of the instant offense, to wit, the capital murder of the victim, and then we will turn to the question of whether the state has met its burden to prove the elements of burglary of a habitation and aggravated sexual assault.

■ This Court set out the rules for proof of the corpus delicti of a murder when the state relies on a confession in its proof at trial in *Self v. State*, 513 S.W.2d 832 (Tex.Cr.App.1974). First, the body or remains of the body of the victim must be found and identified. Second, it must be proven that the death of the victim was caused by the criminal act of another. *Self, supra*, at 834–835.

"Proof of the corpus delicti may not be made by an extrajudicial confession alone, but proof of the corpus delicti need not be made independent of an extrajudicial confession. If there is some evidence corroborating the confession, the confession may be used to aid in the establishment of the corpus delicti."

*Self v. State, supra*, at 835.

■ The relationship between the need to prove the corpus delicti, the use of a confession in proof at trial, and the burden of proving the guilt was explained in *Dunn v. State*, 721 S.W.2d 325 (Tex.Cr.App.1986):

"Thus, under *Self, supra*, if the evidence apart from the appellant's confession reflects that the body of the deceased was *identified* and *death was shown to have been caused by the criminal act of another*, the corpus delicti was thus established. If the appellant in his confession admits killing the deceased under circumstances sufficient to prove murder, the evidence will be deemed sufficient to sustain a conviction for murder. *Brantley v. State*, 522 S.W.2d 519 (Tex.Cr.App. 1975). However, proof of the corpus delicti may not be made by an extrajudicial confession alone, but proof of the corpus delicti need not be made independent of an extrajudicial confession. If there is some evidence corroborating the confession, the confession may be used to aid in the establishment of the corpus delicti."

*Dunn v. State, supra*, at 333–334. See also *Moore v. State*, 700 S.W.2d 193 (Tex. Cr.App.1985); and *Baldree v. State*, 784 S.W.2d 676 (Tex.Cr.App.1989).

In the instant case, testimony showed that the body of Marietta Bryant was found on the floor of her bathroom in her apartment on July 16, 1985, and in circumstances that would indicate she had been sexually assaulted, was identified by her M.H.M.R. caseworker, and was transported to the Harris County Medical Examiner's Office on the next day. The medical examiner testified that Bryant died as a result of her throat being cut with a sharp object. In his confession, appellant stated that after sexually assaulting Bryant at knifepoint, he cut her throat with a butcher

knife which he had found in her apartment. The medical examiner testified that Bryant's fatal wound was inflicted by a left-handed person. Investigator Ray testified that appellant signed his confession with his left hand. The police who investigated the scene of the crime discovered a large knife on the floor next to the body of Bryant. The evidence in the instant case was sufficient to prove the corpus delicti of the capital murder of Marietta Bryant, and to show that appellant caused that death by the criminal act of cutting her throat with a knife. *Self v. State,* 513 S.W.2d, at 835; and *Dunn v. State,* 721 S.W.2d, at 333–334.

Turning to the question of the sufficiency of the evidence to prove the underlying elements of the burglary of the habitation of Marietta Bryant and the aggravated sexual assault of Marietta Bryant, we are governed by the standard of review set out by this Court in *Blankenship v. State,* 780 S.W.2d 198 (Tex.Cr.App.1988).

> "we must look at all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have believed the element beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). **We are not to sit as a thirteenth juror reweighing the evidence or deciding whether we believe the evidence established the element in question beyond a reasonable doubt;** rather, we are to ask ourselves whether the trier of fact, acting rationally, could have found the evidence sufficient to establish the element beyond a reasonable doubt. *Moreno v. State,* 755 S.W.2d 866, 867 (Tex.Cr.App.1988). ...we test the evidence to see if it is at least conclusive enough for a reasonable factfinder to believe based on the evidence that the element is established beyond a reasonable doubt. *Jackson,* 443 U.S. at 318, 99 S.Ct. at 2788, 61 L.Ed.2d at 573. See also *Butler v. State,* 769 S.W.2d 234 (Tex.Cr.App.1989)."

*Blankenship v. State, supra,* at 206–207.

In the instant case, the state introduced appellant's confession along with other physical evidence to establish the element of burglary of Marietta Bryant's habitation. Appellant's fingerprints were found at several spots inside the apartment, including on a band aid box in the bathroom where the body of Bryant was discovered. In spite of appellant's employment at the apartments, there was no evidence at trial that he had ever legitimately been inside the victim's apartment. Appellant was found to be in recent possession of the victim's radio/cassette player, which her family testified she would not voluntarily relinquish. Lastly, in his own confession, appellant stated that Bryant's roommate refused him permission to enter the apartment and that he had to force his way into the apartment. Bryant demanded to know why appellant was there and who he was, whereupon appellant forced her back into her bedroom brandishing a knife. In the light most favorable to the verdict, we find there was sufficient evidence for a rational trier of fact to conclude beyond a reasonable doubt that appellant entered the apartment without the consent of Marietta Bryant. *Blankenship v. State,* 780 S.W.2d, at 206–207; and cases cited therein.

We reach this conclusion even though the victim was, of course, unable to testify at trial that she did not consent to appellant's entry into her apartment. Instead, in the above review of the evidence at trial, we conclude that a reasonable factfinder could have reached this conclusion based on circumstantial evidence that Marietta Bryant refused consent to appellant's entry. *Fearance v. State,* 771 S.W.2d 486, at 510–511 (Tex.Cr.App.1988).

In the instant case, the state introduced appellant's confession along with other physical evidence to prove the element of the aggravated sexual assault of Marietta Bryant. Her body was found sprawled face-down on the bathroom floor with her night gown pulled up around her waist and her undergarments missing. A bottle of Mazola cooking oil and a large butcher knife were found on the floor next to her body. As noted above, appellant's fingerprints were recovered from an item in the bathroom. A cigarette butt of the brand

appellant smoked was found in the sink and a burnt out match was found on the body of the victim. Lastly, in appellant's confession, he stated that he forced the victim into the bathroom and made her comply with his orders at knifepoint. He also stated that he penetrated the victim both anally and vaginally during the course of this aggravated sexual assault. In the light most favorable to the verdict, we find there was sufficient evidence for a rational trier of fact to conclude beyond a reasonable doubt that the victim did not consent to sex with appellant, and that appellant penetrated the victim anally and vaginally while holding her at knifepoint. *Blankenship v. State*, 780 S.W.2d, at 206–207; and cases cited therein.

Appellant argued that penetration was not established by the state because the medical examiner was unable to testify as to the presence of physical trauma on the body of the victim. At trial, the medical examiner testified that due to the decomposition of the victim's body, it was impossible for him to tell whether there was evidence of a sexual assault on the body of the victim. We note that the indictment in the instant case alleged that appellant caused the victim's death while "committing and **attempting to commit** the offense of ... aggravated sexual assault of the said Marietta Bryant." As in *Lincecum v. State*, 736 S.W.2d 673, at 680–681 (Tex.Cr.App.1987), the absence of physical evidence of the penetration of the victim does not detract from our conclusion that there was sufficient evidence for a rational trier of fact to conclude that appellant committed penetration of the victim. Appel-

lant's sixth, seventh, eighth, and ninth points of error are overruled.[3]

In appellant's tenth point of error, he argued that the trial court abused its discretion when it denied his request for a hearing on his motion for new trial. This point of error is controlled by old Art. 40, V.A.C.C.P. (repealed 1986)[4], since the motion was filed on April 19, 1986, and overruled by operation of law on July 3, 1986. Art. 40.05(c) (repealed). Appellant contends that his motion for new trial was supported by an affidavit sufficient to call for a hearing so that he could develop testimony that the jury considered evidence outside the record in reaching its verdict on guilt or innocence. Art. 40.03(7), V.A.C.C.P. (repealed). Appellant cites this Court's decision in *McIntire v. State*, 698 S.W.2d 652 (Tex.Cr.App.1985) in support. Appellant's argument fails for two reasons.

First, the affidavit in support of appellant's motion for new trial in the instant case did not demonstrate a reasonable ground for believing that juror misconduct actually occurred. Appellant was not entitled to a hearing on his motion for new trial. In *McIntire, supra,* this Court held:

"As a matter of pleading and as a prerequisite to obtaining a hearing, keeping in mind that the purpose of the affidavit requirement is to limit the parameters of the hearing that is sought, we hold that an affidavit is sufficient if it demonstrates that reasonable grounds exist for believing that jury misconduct occurred."

---

**3.** Even if this Court had accepted appellant's argument that the state was bound to a burden to prove the corpus delicti of the underlying elements of burglary of a habitation (to wit, entry of the habitation without consent) and aggravated sexual assault (to wit, penetration of the victim without consent), this Court would have been able to conclude that under the standard set out in *Self v. State*, 513 S.W.2d 832 (Tex.Cr.App.1974) and *Dunn v. State*, 721 S.W.2d 325 (Tex.Cr.App.1986), the state proved the corpus delicti of those two underlying offenses.

Appellant's confession contributed proof towards the corpus delicti of both the burglary

and the aggravated sexual assault. Evidence in the confession of the corpus delicti of the burglary was corroborated by the otherwise unexplained presence of appellant's fingerprints within the apartment and his recent possession of stolen property of the victim. Evidence in the confession of the corpus delicti of the aggravated sexual assault was corroborated by the condition of the victim's body and the presence of the cooking oil and the butcher knife. *Self v. State, supra,* at 834–835, and *Dunn v. State, supra,* at 333–334.

**4.** Now see Tex.R.App.Proc.Rule 31, effective September 1, 1986.

*McIntire v. State, supra,* at 658. See also, *Green v. State,* 754 S.W.2d 687, at 688 (Tex.Cr.App.1988).

In the instant case, appellant contends the juror's affidavit established a reasonable ground to believe that the jury went outside the record to consider evidence to decide guilt or innocence. However, the affidavit of the juror in the instant case unequivocally denied the occurrence of juror misconduct. In his affidavit, the juror stated, "the jury did not unanimously believe beyond a reasonable doubt that the defendant's confession was given voluntarily ..., and therefore, we ... **based our verdict solely on the other evidence submitted by the state."** This distinguishes the instant case from *McIntire* on the facts. *Compare with McIntire v. State, supra,* at 659 and 660. As such, appellant failed to demonstrate reasonable grounds to believe that juror misconduct occurred. Art. 40.03(7), *supra* (Repealed); *McIntire v. State, supra;* and *Green v. State, supra.*

 Second, as the state points out, appellant failed to present this motion for new trial to the trial court within ten days after it was filed on April 19, 1986. Art. 40.05(d), V.A.C.C.P., (Repealed). Compare *McIntire v. State,* 698 S.W.2d, at 660. Therefore, the motion was not properly before the trial court to rule upon. *Dugard v. State,* 688 S.W.2d 524, at 530 (Tex.Cr. App.1985). See *Williams v. State,* 780 S.W.2d 802, at 803 (Tex.Cr.App.1989), overruling *Dugard* on another ground unrelated to this decision. The trial court did not abuse its discretion in not holding a hearing on appellant's motion for new trial. Appellant's tenth point of error is overruled.

In appellant's eleventh point of error, he argues the trial court erred when it denied appellant the opportunity to present Wanda McNeil's testimony regarding appellant's statements to her after his arrest. Appellant contends this testimony was relevant to his argument that his confession was involuntarily taken. Wanda McNeil would have testified that appellant told her in private on July 30, 1985 while he was in custody that "he was going to stop all questioning and they were absolutely going to charge him and get a lawyer or he was going home."

At trial, the state objected this testimony was inadmissible as hearsay. The trial court sustained the state's objection, and appellant argued that it was "germane on the issue of voluntarily ...". The following exchange occurred:

COURT: How is that an exception to the hearsay rule?

DEFENSE COUNSEL: It goes to his state of mind.

COURT: How is that an exception?

DEFENSE COUNSEL: It's illustrative of his state of mind; with regard to the fact that he wanted an attorney and that he wanted to terminate the interview.

COURT: I'll sustain the objection. Anything else you care to say?

DEFENSE COUNSEL: Well, I'll have to think about it.... (later, when appellant tried again to elicit the same testimony)

DEFENSE COUNSEL: It's illustrative of his state of mind.

COURT: Are you offering it for the proof of the fact that he asked for an attorney?

DEFENSE COUNSEL: Yes.

COURT: Then, why isn't it hearsay?

DEFENSE COUNSEL: Well, irrespective of the offer, it would be an exception to the hearsay rule.

 On appeal, appellant argues that McNeil's testimony was admissible because an utterance is admissible under the res gestae exception to the hearsay rule upon a showing of spontaneity. In support, appellant cites *Ward v. State,* 657 S.W.2d 133 (Tex.Cr.App.1983), as well as Tex.R.Crim. Evid. Rule 803(1), "Present sense impression", Rule 803(2), "Excited Utterance", and Rule 803(3), "Then existing mental, emotional, or physical condition".

Initially, *Ward v. State,* if anything, supports the state's position that the testimony was not admissible as a spontaneous utterance. In *Ward,* this Court stated:

"This Court has consistently held that there must be a showing in the record

that the declarant was excited or in the grip of a shocking event°so as to render the statement a spontaneous utterance."

*Ward v. State, supra,* at 136.

At trial in the instant case, there was no showing that appellant's statement to McNeil, if it occurred, was made while he was excited or in the grip of a shocking event. As with the defendant's wife in *Ward,* appellant's statements were made in response to conversation with McNeil.

■ Secondly, we note that appellant's argument at trial of the relevance of his state of mind does not comport with his argument on appeal under Rules 803(1) and (2).

■ Third, under Rule 803(3), McNeil's testimony would not be admissible to show appellant's state of mind because it is nothing more than a statement of "memory or belief to prove the fact remembered or believed", specifically, that appellant allegedly wished to terminate the interview and secure the advice of counsel. In 33 Goode, Wellborn and Sharlot, Texas Rules of Evidence: Civil and Criminal, § 803.7, at 582, the authors point out that this limitation on the exception is a practical necessity. They quote Justice Cardozo, that "there would be an end, or nearly that, to the rule against hearsay if the distinction were ignored." The authors also quote from the Notes of the Advisory Committee to the Federal Rules of Evidence:

> "The exclusion of "statements of memory or belief to prove the fact remembered or believed" is necessary to avoid the virtual destruction of the hearsay rule which would otherwise result from allowing state of mind, provable by a hearsay statement, to serve as the basis for an inference of the happening of the event which produced the state of mind."

*33 Goode, Wellborn and Sharlot, supra,* at 911.

McNeil's testimony was not admissible as an exception to the hearsay rule as a spontaneous utterance, or under Tex.R.Crim. Evid. Rules 803(1), (2), or (3). Appellant's eleventh point of error is overruled.

The judgment of the trial court is affirmed.