IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 





NO. 3-93-107-CR





FELIX HERNANDEZ,



 APPELLANT


vs.





THE STATE OF TEXAS,



 APPELLEE



 




FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT



NO. 0926118, HONORABLE WILFORD FLOWERS, JUDGE PRESIDING



 





 A jury found appellant guilty of involuntary manslaughter. Tex. Penal Code Ann.
§ 19.05 (West 1989). The punishment, enhanced by two prior felony convictions, was assessed
by the trial court at confinement for 65 years. Appellant appeals and presents eleven points of
error. We will affirm the judgment.

 In his first four points of error, appellant urges that the trial court erred in denying
his motion for a directed verdict, and that the evidence is neither legally nor factually sufficient
to support the jury's verdict. In reviewing the legal sufficiency of the evidence, the relevant
question is whether, after reviewing the evidence in the light most favorable to the State, any
rational trier of fact could have found the essential elements of the criminal offense beyond a
reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); Moreno v. State, 755 S.W.2d
866, 867 (Tex. Crim. App. 1988). When conducting a factual sufficiency review, we do not view
the evidence in the light most favorable to the verdict. Instead, we consider all the evidence
equally, including the testimony of defense witnesses and the existence of alternative hypotheses. 
Orona v. State, 836 S.W.2d 319 (Tex. App.--Austin 1992, no pet.). We will set aside a verdict
for factual insufficiency only if it is so contrary to the overwhelming weight of the evidence as
to be clearly wrong and unjust. Stone v. State, 823 S.W.2d 375, 381 (Tex. App.--Austin 1992,
pet. ref'd as untimely filed).

 The State relies on circumstantial evidence to prove that appellant shot and killed
Rick Guerrero. Joe Guana, a 17-year old friend of Rick Guerrero, testified that "we sort of
became like brothers." Joe was raised by his grandparents, but he was attending school and
working for the deceased's father, Moses Guerrero. Joe lived with the Guerreros during the week
but stayed with his mother Angie Mendoza on weekends. Angie Mendoza and appellant lived
together in a home in a small trailer park. Joe and Rick planned to go out together late in the
evening on December 11, 1991. Joe went to his mother's home to get some clothes. Angie was
sleeping on the couch in the living room and appellant was on the couch drinking beer and
watching television when Joe went to the bedroom. Joe was listening to the radio but fell asleep
while awaiting a call from Rick.

 Joe was awakened about 1:00 a.m. by his mother's screaming. She called to him
"to go see what Felix did." Joe got up and ran into the living room. Joe's mother told him "to
go see what Felix did." Joe went outside where he saw Rick's truck with the motor running and
the radio playing loudly. Rick was lying on the ground and appellant was standing over Rick. 
Joe did not see anyone else. Appellant "mumbled something at first, then he said he just hit him,
he is okay." Appellant then walked into the house. Joe ran to his friend Rick, turned him over
and tried to resuscitate him because Rick was not breathing and blood was coming from his nose
and mouth. When Joe was not successful in his resuscitation effort he went inside and called
emergency medical services. Angie and appellant were arguing and appellant was getting dressed
and putting his boots on. Appellant picked up a gun, stuck it under the front part of his pants,
and said he had to leave. The gun was a long barreled "western gun." Appellant left in Angie's
truck. Joe went back outside and turned off the radio and the motor of Rick's truck.

 When the emergency medical attendants arrived, they took Rick's shirt off and
made an unsuccessful effort to resuscitate him. Law enforcement officers and Rick's father,
whom Joe called, came to the scene. When deputy sheriff Frank Lofton arrived, he saw Rick's
truck about twenty feet from the front of Angie's house. Lofton found no blood in Rick's truck. 
The hood of the truck was warm. Rick's body was between Rick's truck and the house.

 Dr. Roberto J. Bayardo, Travis County Chief Medical Examiner, testified that
19-year old Rick Guerrero's death was caused by a gunshot. Dr. Bayardo described the path of
the projectile which entered the deceased's neck at a point two inches to the left of the midline just
above the left collar bone. The bullet severed blood vessels that go to the upper arm. It then
passed through the left lung striking the spine on the left side. The path of the bullet was from
front to back and down at about a 35-degree angle. The bullet severed a large artery. Although
the bullet did not sever the spinal cord, it fractured two ribs and struck bones of the vertebrae. 
Dr. Bayardo explained that when a bullet strikes the spinal column, but does not sever it, it
produces a shock wave that severs the nerves "physiologically, not anatomically." This would
cause the victim to drop to his knees and to the ground, or he would stagger a few steps and then
fall down. Dr. Bayardo recovered a .38 calibre copper-jacketed bullet from the deceased's back. 
There were powder burns near the entrance of the gunshot wound on deceased's neck. The
pattern of the powder burns indicated that the deceased had "flexed" his head down and to the left
before the shot entered his neck. In Dr. Bayardo's opinion, the gun was so close to the deceased
when fired that the deceased's jaw had been scratched and cut by the gun sight.

 Appellant was arrested more than twenty-four hours after he fled from the scene
of the shooting. Appellant strenuously resisted arrest. Appellant made a written statement in
which he said he was asleep on the couch with Angie when he was awakened at about 1:00 a.m.
by a "bunch of loud music." He looked through the front door curtain and saw Ricky staggering
towards the house. "There was nobody else around. He was by himself. . . . I had to go because
I had a blue warrant [issued for parole violation] on me. I do not own a gun and I did not have
a gun when this happened." 

 After appellant's arrest, officers used swabs to gather any residue that might be on
appellant's hands. When the residue obtained was analyzed, it contained lead, barium, and
antimony. Lead, barium, and antimony are in materials used in cartridge primers. Particles of
those elements escape when a cartridge is fired. The State's expert witness testified that the test
showed appellant could have fired a gun. However, since the amount of antimony was small, the
test was not conclusive. The weapon used to kill the deceased was not recovered. Although
appellant denied owning a gun, Joe Guana testified appellant took a long barreled "western gun"
when he left. Guana had also seen appellant with the gun tucked in his pants when he went to a
flea market several days before the night the deceased was shot. Some .22 calibre cartridges were
found in the house where appellant and Angie lived but no larger calibre ammunition was found. 
There was no evidence of prior difficulties between appellant and the deceased.

 The elements of the offense of involuntary manslaughter are: (1) a person (2)
recklessly (3) causes the death of an individual. The evidence reveals no motive for appellant to
kill the deceased, except perhaps that appellant was provoked when he was awakened by the loud
music coming from the radio in the deceased's truck. Appellant gave a plausible, but also self
serving, reason for fleeing before investigating officers arrived on the scene. Appellant, after his
arrest, made a written statement in which he said he did not own a gun and did not have a gun
"when this happened." The jury, if it wanted to, could disbelieve appellant's claim that he fled
only because of the unserved parole violation warrant which he thought had been issued. Guana's
testimony controverted appellant's claim that he did not own or have a gun at the time and place
where the offense was committed. Appellant saw Rick when Rick came to the house, and
appellant saw no one else in the area. Guana saw appellant standing over Rick's body, and as
appellant walked toward the house appellant said, "I hit him." Appellant quickly dressed and fled
from the scene with a large "western gun" tucked in his pants. There was no blood in the
deceased's truck. The deceased could not have moved more than a few steps after he received
the wound which killed him. The deceased had to have been shot as he was getting out of his
truck or when he was walking from the truck to the house a short distance away. The deceased's
assailant was close enough that the fatal shot left powder burns on his neck and he was caused to
flex his neck to the left. The expert's opinion was that the gun sight cut and scratched the
deceased's jaw. The jury could infer that the gun Guana saw appellant leave with was the weapon
used to kill the deceased. Appellant himself stated he saw no one else other than the deceased
outside the house. The parts of appellant's written statement, such as those stating that he did not
own or possess a gun, which differed from other evidence, the jury could believe untrue and
therefore incriminating. Also the jury could consider appellant's flight and resistance of arrest
as incriminating.

 In reviewing the evidence in the light most favorable to the jury's verdict we find
that the jury as a rational trier of fact could properly find the essential elements of involuntary
manslaughter were proved beyond a reasonable doubt. The test for legal sufficiency of evidence
was met. This is a circumstantial evidence case, but we no longer apply the "no other reasonable
hypotheses test" as an appellate standard in determining the sufficiency of evidence. Geesa v.
State, 820 S.W.2d 154 (Tex. Crim. App. 1991). In determining whether the evidence is factually
sufficient, even if we view the evidence without the prism of "in the light most favorable to the
prosecution," we hold the verdict is not so contrary to the overwhelming weight of the evidence
as to be clearly wrong or unjust. The trial court did not err in denying appellant's motion for a
directed verdict, and the evidence is sufficient to support the jury's verdict and the court's
judgment. Points of error one through four are overruled.

 In his fifth point of error appellant urges that the trial court erred in permitting the
State's expert witness to testify that the gun-powder-residue tests performed on appellant were
evidence that appellant had fired a gun. Appellant argues that the "sole purpose of the testimony
was to suggest to the jury that, while scientifically no conclusion could be drawn, an inference of
guilt could still rationally be made. In other words, the State offered a not-so-subtle inference of
guilt from a chemical test which the State's own agents decided was scientifically inconclusive." 
Appellant argues further that: "It was an invitation to depart from scientific rationality for
medieval sophistry: the atomic absorption test was inconclusive; ergo, appellant must have fired
the manslaughter weapon."

 Appellant timely objected to the expert's testimony concerning the results of the
atomic absorption test, but appellant stipulated that the atomic absorption test is a reliable test. 
The test is used to determine whether a suspected person has recently fired a gun. Cartridge
primers contain three elements: lead, barium, and antimony. A suspect's hand is swabbed and
any materials which may cling to the swabs are dissolved and the residue is subjected to a
procedure to determine if the three elements found in cartridge primers are present. In this case
all three elements were found, but the amount of antimony found was so small that the experts
who conducted the test could not be positive that appellant had fired a weapon. Their finding was
"inconclusive." 

 The residue from appellant's hands was not obtained immediately after the
shooting, since appellant was arrested more than twenty-four hours after the victim was shot. The
expert was cross-examined and appellant offered expert testimony concerning the elements lead,
barium, and antimony and their presence on the hands of people working in various occupations. 
He studied the State's expert's written report on the results of atomic absorption test. The defense
expert testified that the result of the analysis of the residue from appellant's hands was no different
than the result that would be expected in an analysis of the residue from the hands of a machine
shop employee.

 Relevant evidence is generally admissible. Tex. R. Crim. Evid. 402. Although
relevant, evidence may be excluded if its probative value is substantially outweighed by the danger
of unfair prejudice. Tex. R. Crim. Evid. 403. The Court of Criminal Appeals has interpreted
this rule to "simply mean that trial courts should favor admission in close cases, in keeping with
the presumption of admissibility of relevant evidence." Montgomery v. State, 810 S.W.2d 372
(Tex. Crim. App. 1990). The trial court did not abuse its discretion in admitting the results and
explanation of the atomic absorption test. Point of error five is overruled.

 In his sixth point, appellant declares that the trial court erred in allowing the State
to impeach Angie Mendoza with a written statement, which she made to investigating officers,
that revealed her prior opinion regarding appellant's guilt or innocence. Angie Mendoza was a
defense witness. In cross-examination, the State, over defense objection, was allowed to use a
written statement Mendoza made to investigating officers. The error, if any, in allowing the use
of Mendoza's statement in an attempt to impeach her was cured by the later admission of the
statement without objection. Error in the admission of evidence may be cured when the same
evidence comes in elsewhere without objection. Stoker v. State, 788 S.W.2d 1 (Tex. Crim. App.
1989); Hudson v. State, 675 S.W.2d 507, 511 (Tex. Crim. App. 1984); Paloma v. State, 656
S.W.2d 229, 232 (Tex. App.--Austin 1983, no pet.). Point of error six is overruled.

 In point of error seven, appellant argues that the trial court erred in refusing to
permit defense counsel to cross-examine detective Rick Wines concerning another suspect in the
case. Appellant contends the trial court's ruling deprived him of a fair trial and denied his Texas
constitutional right of confrontation and cross examination of Wines. The deceased's father hired
Nick Roberts, an attorney, to investigate and explore the possibility of bringing a civil action for
the death of his son. That attorney investigated in the neighborhood where the criminal offense
occurred. While he was talking with a man in the neighborhood, "a nine year old kid and another
little kid at somewhere seven to nine came up and one of the kids said that he had heard that
someone else was outside with Felix that night." The person with whom the attorney was
speaking told the attorney to leave, to "get out." The attorney became suspicious and reported
the incident to the prosecutor. The prosecutor asked Wines to investigate the matter which the
attorney had reported.

 During the State's case-in-chief, Wines testified that on the night of the offense
officers asked several other residents of the trailer park if they had heard anything or knew
anything about the offense. This investigation produced no evidence.

 When Wines, acting on the prosecutor's request, investigated in the trailer park he
talked to the man to whom Roberts had talked. Wines was satisfied that the man in the trailer
park was telling him the truth and that the man knew nothing about the shooting. Wines did not
talk to, nor did he learn the names of, the two children that allegedly told Roberts that there was
another man with appellant the night the offense was committed.

 The trial court heard Wines' testimony and allowed defense counsel to cross-examine Wines out of the presence of the jury. Appellant's counsel stated, "All I am trying to
get into is the fact that they had information from two children that there was another man at or
near the scene that night." The court would not allow appellant's counsel to go into this matter
before the jury, saying: "We are wasting time."

 The State argues, we believe correctly, that the issue is whether the trial court
abused its discretion in refusing to allow appellant to go into the matters which the trial court
found inadmissible even though relevant. Tex. R. Crim. Evid. 403. In explaining Rule 403 it
has been said: "Suppose the probative value of the evidence is quite weak. While the evidence
may not be rejected as irrelevant, its weak probative value increases its vulnerability to exclusion
under Rule 403 because its probative value may be substantially outweighed by one or more of
the countervailing considerations recited in Rule 403." 1 Steven Goode, Olin Guy Wellborn III,
& M. Michael Sharlot, Guide to the Texas Rules of Evidence: Civil and Criminal, § 401.3 at 94
(Texas Practice 2d ed. 1993). The trial court found that the evidence which defense counsel
wanted to elicit before the jury on cross-examination was not admissible under Rule 403. 
Considerations of confusion and undue delay, as well as waste of time, could well have caused
the trial judge to exercise his discretion to disallow the proposed questions. The record supports
the trial court's ruling. The trial court did not abuse its discretion in disallowing appellant's
cross-examination of Wines before the jury on this matter. Point of error seven is overruled.

 In point of error eight, appellant asserts the trial court erred in refusing to grant a
mistrial when Lieutenant Jamie Page volunteered information not responsive to the State's
question. Page was one of the officers who went to arrest appellant. He was asked: "Would you
describe what he was wearing?" He answered: "Felix, Hispanic male, about 52, 53 years old. 
Salt and pepper black hair, and most of his upper torso is covered in tattoos, which is not visible." 
The trial court promptly sustained appellant's objection, and instructed the jury to disregard the
answer, but denied the requested mistrial. Not every improper response requires reversal. Except
in extreme cases, the error is cured if timely objection to the remark is sustained and the trial
court instructs the jury to disregard. Stoker v. State, 788 S.W.2d 1, 13 (Tex. Crim. App. 1989);
Livingston v. State, 739 S.W.2d 311, 335 (Tex. Crim. App. 1987). Appellant urges us to apply
a more stringent rule to police officers, than we apply to other witnesses. We decline the
invitation to apply a more stringent rule to police officer witnesses. Point of error eight is
overruled.

 Appellant, in point nine, claims the trial court erred in refusing his timely request
to instruct the jury on the lesser offense of criminally negligent homicide. The trial court
instructed the jury on both murder and involuntary manslaughter, but refused appellant's requested
jury instruction on criminally negligent homicide. The jury found appellant guilty of involuntary
homicide. When timely requested, a jury instruction on a lesser included offense should be given
if the offense for which the requested instruction is made is a lesser included offense of the offense
charged and there is evidence from which the jury could reasonably conclude that, if guilty, the
accused is guilty of only the lesser included offense. Ramos v. State, 865 S.W.2d 463 (Tex.
Crim. App. 1993); Lincecum v. State, 736 S.W.2d 673 (Tex. Crim. App. 1987); Royster v. State,
622 S.W.2d 442 (Tex. Crim. App. 1981). Criminally negligent homicide, Tex. Penal Code Ann.
§ 19.07 (West 1989), is a lesser included offense of both murder and involuntary manslaughter. 
Tex. Code Crim. Proc. Ann. art. 37.09 (West 1981); Saunders v. State, 840 S.W.2d 390, 391
(Tex. Crim. App. 1992); Thomas v. State, 699 S.W.2d 845, 847 (Tex. Crim. App. 1985); Aliff
v. State, 627 S.W.2d 166 (Tex. Crim. App. 1982). 

 There are two ways in which the evidence may indicate that a defendant is guilty
of only the lesser included offense. First, there may be evidence which refutes or negates other
evidence establishing the greater offense. Saunders v. State, 840 S.W.2d 390 (Tex. Crim. App.
1992). If "the defendant simply denies commission of the offense . . . then the charge on the
lesser offense would not be required." Id. at 392.

 It is well established that if evidence from any source raises the issue of a lesser
included offense and a timely request is made, an instruction on that offense must be included in
the court's charge. Id. at 391. The credibility of the evidence and whether it conflicts with other
evidence must not be considered in deciding whether the instruction on the lesser offense should
be given. Id. Appellant did not testify, and he offered no evidence bearing on his mental state
when he shot the deceased. The State's evidence is the only source of evidence from which
appellant's mental state at the time he fired the shot may be determined. In his statement, which
was offered by the State and admitted by the court, appellant said he "saw Ricky staggering
towards the house. . . . I do not own a gun and I did not have a gun when this happened." 
Appellant's statement is tantamount to a denial that he shot the deceased and a denial that he
committed the offense. He was not entitled to an instruction on the lesser included offense of
criminally negligent homicide. Saunders, 840 S.W.2d at 390; see also Thomas v. State, 699
S.W.2d 845 (Tex. Crim. App. 1985); Godsey v. State, 719 S.W.2d 578 (Tex. Crim. App. 1986);
Ramos v. State, 865 S.W.2d 463 (Tex. Crim. App. 1993).

 Appellant asserts that whatever inferences raise the issue of involuntary
manslaughter must necessarily raise the issue of criminal negligence. This of course is not the
test to determine whether a lesser included instruction should be given. A defendant is not entitled
to a lesser included offense instruction merely because in proving the greater offense the State also
proves the lesser offense. Gibbs v. State, 819 S.W.2d 821 (Tex. Crim. App. 1991); Hall v. State,
630 S.W.2d 709 (Tex. Crim. App. 1981). Appellant's assertion, without further argument that
the trial court's failure to permit the jury to pass on the question of criminal negligence violated
his state constitutional rights, is without merit. The trial court did not err in refusing to instruct
the jury on the lesser included offense of criminally negligent homicide. The ninth point of error
is overruled.

 In point of error ten, appellant complains of the trial court's jury instruction
defining reasonable doubt. The definition submitted to the jury is the definition the Court of
Criminal Appeals mandated in Geesa v. State, 820 S.W.2d 154 (Tex. Crim. App. 1991). 
Appellant's argument is one to be addressed to the Court of Criminal Appeals, not this Court. 
Point of error ten is overruled.

 In point eleven, appellant complains of the trial court's refusal to instruct the jury
on alternative reasonable hypotheses. Such an instruction in circumstantial evidence cases is no
longer required. Hankins v. State, 646 S.W.2d 191 (Tex. Crim. App. 1983). Appellant's
complaint and argument is for the Court of Criminal Appeals, not this Court. Point of error
eleven is overruled.

 The judgment of the trial court is affirmed.



 

 Carl E. F. Dally, Justice

Before Justices Kidd, B. A. Smith and Dally*

Affirmed

Filed: June 29, 1994

Do Not Publish
















































* Before Carl E. F. Dally, Judge (retired), Court of Criminal Appeals, sitting by assignment. 
See Tex. Gov't Code Ann. § 74.003(b) (West 1988).