**Opinion filed August 16, 2012**



In The

# Eleventh Court of Appeals

_____

## No. 11-10-00224-CR
_____

## JOE LUTHER WILLIS, Appellant

## V.

## STATE OF TEXAS, Appellee

**On Appeal from the 29th District Court**
**Palo Pinto County, Texas**
**Trial Court Cause No. 14039B**

## M E M O R A N D U M   O P I N I O N

The jury convicted Joe Luther Willis of engaging in organized criminal activity and assessed his punishment at confinement for life in the Institutional Division of the Texas Department of Criminal Justice along with a fine of $250,000. Because we disagree with Willis's sole complaint that the evidence is insufficient to support the conviction, we affirm. In two issues, Willis challenges both the legal and factual sufficiency of the evidence. The Court of Criminal Appeals in *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010), abandoned the factual sufficiency standard, and we need only consider the sufficiency of the evidence under the legal sufficiency standard.

The grand jury indicted Willis for engaging in organized criminal activity on or about March 1, 2005, through April 1, 2007, with intent to establish, maintain, or participate in a combination or the profits of a combination comprised of Willis and codefendants Linda Marie Turner, Emily Gwen Gonzalez, Anthony Lavelle Tate, and Cairra Lashonda Clark. The State alleged in the indictment that Willis conspired with his codefendants to commit the offense of possession with intent to deliver cocaine in an amount over 400 grams by agreeing to engage in conduct that constituted that offense and that Willis performed an overt act in furtherance of the agreement: he traveled to Fort Worth on September 28, 2006, and was arrested on his way back to his home in Mineral Wells with an amount of cocaine exceeding 4 grams but less than 200 grams.

In spring 2005, Texas Department of Public Safety Sergeant Darla Dowell was asked by the city manager and by the chief of police of Mineral Wells to investigate an area along 8th Street in Mineral Wells where the sale of cocaine had become "open and rampant." Sergeant Dowell and six other officers began to conduct surveillance of the area. Sergeant Dowell testified that narcotics were being sold in the street day and night, that there were people everywhere, and that the area had a "party atmosphere" with people standing around drinking alcohol at all times. Sergeant Dowell was the case agent in this investigation from its inception until about November 2005, at which time Michael Donald Stoner took over the case. Stoner later became a Texas Ranger, but when he took over this investigation, he was a new member of the Mineral Wells Narcotics Unit. Sergeant Dowell continued to assist in the investigation.

Sergeant Dowell's main goal at the start of the investigation was to identify the individuals who were bringing crack cocaine into Mineral Wells. Sergeant Dowell worked closely with the U.S. Bureau of Alcohol, Tobacco, & Firearms (ATF) out of Fort Worth and originally planned to prosecute the suppliers in the federal courts. The testimony shows that there was an "outcry" from the community and that various individuals came forward with information to assist Sergeant Dowell's team. Individuals in the community identified the homes where people were engaged in illegal activity. The investigators focused on identifying the individuals who lived in the residences and who dealt drugs from those homes.

Sergeant Dowell worked undercover and conducted "cold buys" in which she went into the area and attempted to purchase drugs without the use of an informant. Sergeant Dowell

drove to 8th Street, stopped in front of Willis's house, and honked her car horn, and without more, Clark came out of Willis's house. Sergeant Dowell told Clark that she wanted to buy a $20 "rock" of crack cocaine. Clark got into Sergeant Dowell's vehicle and told Sergeant Dowell to drive up the street to Turner's house. Sergeant Dowell drove to Turner's house and gave Clark $20 in DPS funds. Clark went into Turner's house and came back with a $20 rock of crack cocaine. Clark told Sergeant Dowell to contact her if she needed anything else. Sergeant Dowell testified that "[i]t was that easy" even though Sergeant Dowell did not know Clark prior to the transaction. Sergeant Dowell was able to buy drugs in this exact same way on several different occasions.

In another incident, Sergeant Dowell drove to Willis's residence and saw that a group of people had gathered outside the house. An individual from the group rode over to her car on a bicycle and asked what she wanted. Sergeant Dowell asked for a $20 rock of cocaine, and the man produced one from his pocket and sold it to her. Sergeant Dowell testified that buying the cocaine was easy and that anyone could have done it. Based on her surveillance of the area, many people did; Sergeant Dowell witnessed many drug transactions take place in front of Willis's home.

In addition to interviews with informants and her own undercover work, Sergeant Dowell collected information by video surveillance. Officers made the first video from a nearby property, and they recorded the video with a handheld camera. Later, they obtained video by using a "pole cam"—a camera mounted on a utility pole—that enabled the officers to monitor activities from a remote location. They did not capture any audio recording during the investigation. By these various methods of intelligence gathering, the investigators eventually were able to identify the loosely connected group of people who were involved in supplying the crack cocaine to the area.

Sergeant Dowell was able to develop an organizational chart for the enterprise based on her investigation. In this case, Sergeant Dowell represented the organization as a "spokes" or "wheel-type organization" with no real hierarchy, no one person above anyone else. She explained that it was not structured like a corporation, with a CEO, but that there was a common goal of the organization: to supply crack cocaine on 8th Street in Mineral Wells. Sergeant Dowell identified Willis and his codefendants as the spokes of the wheel; they were the five main distributors of crack cocaine to the area.

3

Sergeant Dowell saw Clark, who lived with Willis, dealing drugs from Willis's house and from Turner's house. She also saw Willis and Turner meeting at Turner's house and speaking to each other on the street. Sergeant Dowell also saw Tate in front of Willis's house several times. The investigators also saw him leaving Willis's house at times when they knew Willis was there. All five codefendants, including Willis, were seen dealing drugs in the street by delivering drugs through car windows. Sergeant Dowell observed meetings between Willis and Turner, Clark and Willis, Clark and Turner, Tate and Willis, Tate and Clark, Gonzalez and Clark, and Gonzalez and Turner.

Defense counsel asked Sergeant Dowell how much crack cocaine a person would have to possess in order to show intent to distribute as opposed to intent to merely possess a controlled substance for personal use. Counsel asked whether there was a "breaking point"—a specific amount of a drug that indicates a person has intent to distribute it. Sergeant Dowell answered, "No," and explained that, even if a street dealer was found to have only a small amount of cocaine, that person would still be in possession of cocaine with an intent to deliver if he or she was observed making sales. Clark sold Sergeant Dowell one $20 rock. Sergeant Dowell explained that five rocks would cost $100 and would amount to approximately one gram of crack cocaine.

Ranger Stoner testified that in September 2005 he was working in the Narcotics Service of the Texas DPS and was assigned to Sergeant Dowell's investigation in Mineral Wells. When Ranger Stoner first became involved with the investigation, he went to the targeted area of 8th Street and saw that people crowded the street all day and all week long. They approached people who were driving down the street. At one place Ranger Stoner saw a large dip in the road. He noticed that, if drivers slowed their vehicles too much to pass through the dip, people from the area walked toward them to sell them drugs.

Ranger Stoner testified that it was the goal of the investigative team to identify and rid the town of drug suppliers. When Ranger Stoner began working on the team, Investigator Jeremy Clayton and Sergeant Dowell had already made undercover buys. Ranger Stoner explained the circumstances surrounding the use of confidential informants in cases of this nature.

John Joseph Polk was Ranger Stoner's confidential informant for several months in this case. Polk initiated contact with the police when he called and offered information on a "major cocaine dealer in Mineral Wells on Southeast 8th Street." Polk volunteered to meet with

4

Ranger Stoner and give him more information. Subsequently, Polk gave Ranger Stoner information on all five codefendants in the case. Ranger Stoner used Polk to make drug buys from Willis. On July 10, 2006, Polk was sent to make a controlled buy from Willis at Willis's house. On that occasion, Polk purchased about five rocks of crack cocaine for $100 from Willis.

As the investigation progressed, Polk informed Ranger Stoner that the drug supply was coming from Fort Worth. Polk identified a particular apartment unit in Fort Worth as the place where Willis purchased drugs. Several attempts were made to follow Willis to the apartment in Forth Worth and to stop him on the way back to Mineral Wells. These efforts were unsuccessful until September 28, 2006. At that time, Ranger Stoner was driving on Interstate 20 from Fort Worth to his home. Ranger Stoner came upon Willis's "noticeable yellow or gold Cadillac." Ranger Stoner contacted DPS and ATF and asked for assistance; he began to follow Willis.

Ranger Stoner confirmed that Willis was in the car; he could also see a female passenger in the car but could not tell the identity of the female passenger. Willis drove to the previously identified apartment in Fort Worth; Ranger Stoner and other law enforcement followed him. The officers saw Willis and his passenger enter the apartment, stay about an hour, and then return to the vehicle. They drove down Interstate 20 toward Mineral Wells. When Willis entered Parker County, Ranger Stoner contacted DPS Trooper Gary Allen, and Trooper Allen stopped Willis.

When he received the request for assistance, Trooper Allen parked his vehicle on the shoulder of the interstate and set up stationary radar. Willis was traveling 70 miles per hour in a 65-mile-per-hour zone, and Trooper Allen stopped him. Willis did not have a driver's license; Trooper Allen discovered that it had expired a year earlier. Willis gave Trooper Allen consent to search the vehicle.

A canine officer, Trooper Brian Roberts, arrived with a drug dog. The dog alerted to the front passenger seat of the vehicle. Trooper Allen asked Clark to step out of the vehicle, and though she was nervous and unresponsive, Clark eventually consented to a pat-down search. Trooper Allen did not touch Clark but did a visual check of her clothing. He saw a bulge in Clark's back pocket and asked her what it was. She pulled a crack pipe out of her pocket and handed it to him. Trooper Allen arrested Clark for possession of drug paraphernalia.

Trooper Allen asked Clark if she had anything else. She denied there were any other drugs on her person, until Trooper Allen informed her that it was a separate offense to take drugs into a penal institution. Clark started crying and admitted that there were drugs in her

undergarments. Trooper Allen requested that a female officer be dispatched to the scene to search Clark. ATF Agent Melanie Finney searched Clark and found a bag of crack cocaine inside Clark's pants.

Clark was known to be Willis's girlfriend. Trooper Allen asked Clark if she was hiding the drugs for Willis. He told Clark not to "take the rap" if the drugs were not really her drugs. Agent Finney testified that, based on all of the information she had, including her past experience as an agent in other drug cases, she suspected that the cocaine belonged to Willis and that he had asked Clark to hide it for him when the traffic stop began. Agent Finney interviewed Clark and obtained additional information from her.

Clark testified that Agent Finney's suspicion was correct. Clark accompanied Willis to Fort Worth that day, but Willis purchased the cocaine. When Trooper Allen stopped Willis, Willis asked Clark to put the cocaine in her pants. Clark did so because, at the time, she loved Willis and would "do anything" for him. Clark was Willis's girlfriend in 2006, and she was eighteen or nineteen years old. She lived with him on 8th Street even though the house was very small and had no utilities and no heat or air conditioning. Clark said that, by living in a house like that, Willis "[p]layed it off better" and was able to sell drugs for a longer period without getting caught. Clark testified that Willis had to "[r]e-up" his stock of cocaine every two to three days and that each time Willis would purchase a cookie of cocaine about the size of the one that was seized during the traffic stop. Willis made about $1,500 in drug sales every two to three days. Clark testified that the sale of crack cocaine was Willis's sole source of income and that she had once counted $10,000 in his safe.

Clark said that she and Willis sold crack cocaine every day. If they did not have any drugs to sell, they could "score" from one of their codefendants. Willis also bought his supply from a man named "Doc" who lived in Fort Worth. Clark accompanied Willis to Doc's apartment on the day of the traffic stop. She went inside the apartment with Willis but waited just inside the door of the apartment while he purchased the drugs. Clark never saw Doc face-to-face.

Clark testified that she received a fifteen-year sentence, the minimum sentence for the offense for which she was indicted. She said that she did not expect any benefit from her testimony against Willis. Clark testified that she was not mad at Willis and that she still loved him.

Polk, Ranger Stoner's confidential informant, corroborated much of Clark's testimony. Polk testified that he volunteered to help the investigation because Willis was giving Polk's mother drugs even though she was in poor health and had lost a leg to diabetes. Willis knew Polk's mother was in bad health and gave her drugs anyway. Polk contacted Ranger Stoner in order to get Willis away from his mother. Polk knew Willis and had visited Willis's home many times; they were old "dope-smoking buddies."

Polk agreed to make controlled buys for the task force. In July 2006, officers picked him up and gave him $100 to purchase crack cocaine from Willis. Polk went to Willis's house on 8th Street; the officers searched him both before and after he went into the house. Polk went in and gave Willis the money, and Willis gave Polk the drugs. Polk left and turned the drugs over to the officers.

During 2006, Polk was around Willis "all the time." Willis always had crack cocaine, usually two or three ounces, throughout 2006 and 2007. Willis was in possession of that amount most of the time, and Polk saw him selling crack cocaine on many occasions. Polk saw Clark sell crack cocaine for Willis. Willis was often in possession of large sums of cash, though he had no job other than selling crack cocaine. Polk had been at Willis's house on occasions when Willis went to Fort Worth to buy drugs from a man called "Doc." He had gone with Willis on several occasions; Willis usually bought two to three ounces and, on at least one occasion, bought three ounces in cookie form. Polk testified that Willis would "re-up" his supply of crack cocaine once or twice a week. The smallest quantity he ever saw Willis buy was one ounce.

Polk testified that he knew Turner, Tate, and "all of them." There was never any hostility among the group because there was enough demand so that everybody could make money. When one group ran short, they would buy from the others; they cooperated with each other to supply their customers with crack cocaine.

In response to defense questions about a specific agreement between Willis and the others regarding the drug trade, Polk explained, "That's not the way it works." He testified that there was no specific agreement regarding splitting profits. It was not always an independent venture, but as far as profit-splitting when the parties sold drugs together, each case was different.

Ranger Stoner testified that he sent the substances from the controlled buys to the DPS lab for testing. State's Exhibit No. 4 was from Polk's purchase of cocaine from Willis on July 10, 2006. State's Exhibit No. 6 was evidence taken from the September 28, 2006 traffic stop of Willis and Clark. DPS chemist William L. Todsen testified that he analyzed two sets of drug evidence in this case. Todsen found 0.80 grams of material that contained cocaine in State's Exhibit No. 4. In State's Exhibit No. 6, Todsen found a knotted baggie that contained 16.42 grams of material including cocaine, a Ziploc that contained 0.13 grams of cocaine, and a crack pipe that contained a trace amount of cocaine. The State rested after Todsen's testimony, and the defense rested without presenting any witnesses.

*Legal Sufficiency*

Appellant contends that the evidence was legally and factually insufficient to support the jury's verdict of guilt. He argues that the evidence was insufficient to prove either the existence of a combination or the 400-gram quantity of drugs that the parties conspired to possess with intent to deliver.

The Court of Criminal Appeals in *Brooks*, 323 S.W.3d at 912, abandoned the factual sufficiency standard, and we need only consider the sufficiency of the evidence under the legal sufficiency standard. The standard of review for an appellate court in evaluating the legal sufficiency of the evidence is to determine whether any rational finder of fact could have found the existence of the elements of the offense after viewing all of the evidence in a light most favorable to the verdict. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks*, 323 S.W.3d 893; *Gibbs v. State*, 819 S.W.2d 821, 834 (Tex. Crim. App. 1991). The appellate court's duty is not to sit as a thirteenth juror reweighing the evidence or deciding whether it believes the evidence established the elements in question beyond a reasonable doubt. *Gibbs*, 819 S.W.2d at 834; *Blankenship v. State*, 780 S.W.2d 198, 206–07 (Tex. Crim. App. 1988). In reviewing the evidence when the appellate court is faced with facts that support conflicting inferences, it must presume that the finder of fact resolved the conflict in favor of the verdict, and any inconsistencies must be resolved in favor of the verdict. *Farris v. State*, 819 S.W.2d 490, 495 (Tex. Crim. App. 1990).

A person engages in organized criminal activity if he commits or conspires to commit a felony offense with the intent to establish, maintain, or participate in either a combination or the profits of a combination. TEX. PENAL CODE ANN. § 71.02 (West Supp. 2012). The State alleged

8

that Willis and his codefendants conspired to commit the offense of possession with the intent to deliver cocaine in an amount over 400 grams. And that Willis's overt act of this conspiracy was possession of cocaine in the amount of more than 3 grams but less than 200 grams on September 28, 2006. The State's burden was to show more than the intent to possess with intent to deliver the cocaine; the State was required to prove Willis's intent to establish, maintain, or participate in a *combination*. *Hart v. State*, 89 S.W.3d 61, 63 (Tex. Crim. App. 2002). Combination is defined as "three or more persons who collaborate in carrying on criminal activities." TEX. PENAL CODE ANN. § 71.01(a) (West 2011).

Direct evidence of the intent to participate in a combination is not required. A jury may infer intent from any facts that tend to prove the combination's existence, including the alleged member's words, acts, and conduct and the method of committing the enumerated offense. *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999) (Meyers, J., concurring). It is permissible to infer an agreement among a group working on a common project when each person's action is consistent with realizing the common goal. *McGee v. State*, 909 S.W.2d 516, 518 (Tex. App.—Tyler 1995, pet. ref'd). But proof of a single ad hoc effort is insufficient. *See Smith v. State*, 36 S.W.3d 908, 910 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd) (evidence that defendant was involved in a one-time transaction is insufficient to establish an organized criminal activity). Instead, the combination must intend to engage in a continuing course of criminal activity. *Nguyen v. State*, 1 S.W.3d 694, 697 (Tex. Crim. App. 1999).

The evidence in this case shows that the five named parties were part of a loosely organized, but organized nonetheless, group that conspired to provide a continuous supply of crack cocaine to the 8th Street area over the course of at least two years. The five codefendants were seen dealing drugs and meeting with each other in the street. Ranger Stoner testified that all of the information that investigators received led them to the conclusion that Willis and Turner were the main distributors in the area, assisted by the other three codefendants. There was evidence that Clark dealt drugs on behalf of Willis. When Sergeant Dowell purchased drugs from Clark, Clark left Willis's house and went to Turner's house to procure the drugs. Cooperation in the criminal enterprise was necessary in this small-town setting because "the people involved all knew each other" and any effort to shut one person out would shut them all down. Ranger Stoner testified that the team had observed the parties working together in drug transactions and that "[t]hey're using one another as a source." Clark and Polk confirmed that

9

the dealers shared their supply and worked together cooperatively to assure that customers always "got served."

This evidence closely aligns with the Penal Code's provision that, in a combination, "participants may stand in a wholesaler-retailer or other arm's-length relationship in illicit distribution operations." Section 71.01(a)(3). This was not merely an ad hoc criminal effort; the evidence shows that the combination engaged in a course of continuing criminal conduct for years. Viewing all of the evidence in a light most favorable to the verdict, a rational factfinder could have found that Willis participated with the others as alleged in the indictment. Willis also argues that the State's evidence was insufficient because no rational factfinder could have found beyond a reasonable doubt "the element of more than 400 grams of cocaine." The State did not allege actual possession of 400 grams of cocaine. Instead, it alleged that Willis "conspire[d] to commit the offense of possession with intent to distribute a controlled substance, namely cocaine, in an amount over 400 grams."

"The offense of engaging in organized criminal activity is drafted in such a way that the predicate offense need not be completed." *Underwood v. State*, 967 S.W.2d 925, 930 (Tex. App.—Beaumont, 1998, pet. ref'd). "'Conspires to commit' means that a person agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense and that person and one or more of them perform an overt act in pursuance of the agreement. An agreement constituting conspiring to commit may be inferred from the acts of the parties." Section 71.01(b). The overt act in pursuance of the conspiracy need not itself be a criminal act. *Barber v. State*, 764 S.W.2d 232, 235 (Tex. Crim. App. 1988).

The State was not required to show that Willis actually completed the predicate offense of possession with intent to distribute 400 grams of crack cocaine. The State was only required to prove that Willis conspired to commit the offense. Proof that Willis and his codefendants had the *intent* to possess (with the intent to distribute) the designated amount would likely be sufficient. However, the jury could have inferred that Willis met, and even exceeded, the 400-gram goal of the enterprise. The evidence at trial showed that Willis delivered a great deal of crack cocaine each week. The State points out that, extrapolating from the testimony given at trial, if Willis bought and sold about sixteen grams per week for the two years covered by the investigation, he would have purchased and delivered over 3,000 grams of cocaine. Willis had a large amount of cash on hand even though he had no other source of income. He was observed

10

selling, or having Clark sell on his behalf, all day and every day for years. He was observed making a buy from his supplier and was found with cocaine in his possession on September 28, 2006, which constituted an overt act in furtherance of the conspiracy. The evidence was sufficient to support Willis's conviction, and his issues are overruled.

The judgment of the trial court is affirmed.


JIM R. WRIGHT

CHIEF JUSTICE


August 16, 2012

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Kalenak, J.